Good morning. Robert Rexford for Mr. Moreno. As the government's attorney put it in his rebuttal closing argument, knowing that that would be the last word the jury heard, quote, the crux of this case, end quote, is whether agents watch Mr. Moreno as he crossed the border. The government attorney then went on to definitively misstate the evidence at trial to make sure that that crux puzzled out in the government's favor. Compounding that problem was that when the defense objected, the district court did not remind the jury that they were the final arbiters of what the facts showed. Rather, in this case, the district court said, quote, well, overruled, go ahead. And this failure to correct the government's attorney, and it needed correcting, or even be agnostic about what the facts showed as evidence, really did heighten the harm to Mr. Moreno. And so it takes Mr. Moreno's case outside of the orbit where these general instructions that the jury does receive, that they're supposed to be the final arbiters of the facts, it takes it outside of the orbit of those cases. Because I think, as this Court has observed, the government's, the government attorney occupies a very unique role in the criminal justice system. And as this Court said, quote, the sovereign's representative means the jury may be misled into thinking his conclusions have been validated by the government's investigatory apparatus, end quote. And that's exactly what happened here. So let's just assume that there was a misstatement of the evidence. Explain to me the prejudice argument. Certainly. I think the best way to look at the harmlessness issue here is to imagine what the government ---- But we're, the whole argument here is prosecutorial, quote, unquote, misconduct. That's what the case law calls it. And so we look at prejudice. Yes. I think the best way to look at prejudice here, whether or not this misstatement harmed Mr. Moreno, is to imagine what the government would do at a retrial. At a retrial, do you think the government's likely going to bring the camera operator, the witness they forgot to bring the first time? Certainly. I mean, it ---- What was the evidence, I mean, what was the state of the evidence as to whether he was actually photographed as he crossed the border? It's actually not a question of him being photographed. There was testimony, and it's in the record, that there's video surveillance. It's real-time video surveillance. Right. So video surveillance. What was the evidence that there was video surveillance that saw him cross the border? And followed him all the way up to apprehension. Precisely. The evidence was twofold. Agent Garcia mentioned, when he talked about these footprints, that he was directed by a camera surveillance team. So there's obviously cameras on Mr. Moreno. Also, defense counsel ---- Well, that's one inference that could be drawn. As I read the record, what you established, or what was established, was that there were cameras posted at various points along the border, which may or may not have watched Moreno Lopez as he crossed the border and made his way to the bushes where he was found. Yes. There was general testimony about the degree of video surveillance at that area of the border. Agent Garcia also specifically said that he was in communication with a video operator being led to Mr. Moreno. Is it the government's burden to establish that there was no surveillance crossing the border on? Yes. I was going to mention that. That's really all the defense needed. When does that arise, that the government has a burden of proving that there was no surveillance from the time he crossed the border? The precise point, I couldn't tell you. It definitely arose in this case because there was an official restraint instruction given to the jury. It was the entire family. No, no, I understand it. I was just curious as to ---- I mean, you know what? The government doesn't do it in every case, does it? No, because it's generally, it's not raised in ---- But here it clearly was an issue and the government doesn't contest, I assume, that it had the burden under the law of showing that he was not surveilled as he was crossing the border up until the time he was arrested? I doubt the government will contest that. They certainly didn't contest it in the briefs. So without this, without the argument as to whether they did surveil him, he would have been acquitted, is that it? Yes. And he should have been on the state of this evidence. And that's, to go back to Judge Wardlaw's question, the state of the evidence, when the government argues harmlessness in their brief, it really does read too much like a sufficiency argument. It doesn't matter how well they proved that Mr. Moreno was a citizen of Mexico. It doesn't matter how well they proved that Mr. Moreno had been deported. It doesn't matter how well they proved that he didn't have permission to come to the United States. The only issue in this case was whether they proved beyond a reasonable doubt. But as I read the cases, being under official restraint, there has to be constant surveillance that watches him as he crosses the border and then tracks him. But it seemed to me that what the testimony was here and what the prosecutor stated here was that the cameras were used to locate him after he crossed the border. There wasn't a constant surveillance from the time that he, watching him cross. And then, I mean, I've been on some of these panels. So that's my understanding of the cases. And the prosecutor didn't really, he said in his statement that you claim it's misconduct, he said that the cameras were used to help locate him after he crossed the border. He did. After. But that's not constant surveillance. I agree. The problem, however, is there's no basis in the facts brought out at trial for the prosecutor to make that statement. That's the problem. You're absolutely right. The case law has to be constant surveillance. There's one case where a brief, you know, briefly of a person, you know, they briefly lose sight. But it is a very brief moment. It has to be constant surveillance. But, I mean, I don't know how. But the, isn't this just a question of, I mean, Judge Pius said assume the violation. The question he asked was is it harmless. And whether it's a violation or not seems to me can be easily determined by looking at the testimony and then looking at what the prosecutor said. But as to the prejudice, it would be prejudicial if, without that statement, the jury wouldn't have convicted. Or without that statement, was it too difficult? Is there sufficient evidence for that in any event, whatever the prosecutor said? Is there sufficient evidence to convict? And if there is sufficient evidence to convict, why is the prosecutor's statement prejudicial? I think, and this is from the Hermannat case, prejudice exists, quote, if it is more probable than not that the government's conduct materially affected the fairness of the trial. Was there sufficient evidence to convict, Mr. Marino? Yes. But if you look at this definitive misstatement, Agent Garcia said this, and this wipes away the defense's only defense. It's hard to go back and say that didn't materially affect the fairness of the trial. It completely, the misstatement here, the two instances, but particularly the second one in the rebuttal closing, completely denied the possibility that Mr. Marino was under constant surveillance. And that possibility was real. I don't know why, I mean, if the evidence at trial, if the government didn't meet its burden at trial of proving that he was not seen, I guess that could prove negative, that he was not seen crossing the border. Why aren't you arguing insufficiency of the evidence? Why are we arguing prosecutorial misconduct? Because, candidly, is there sufficient evidence that he was not under surveillance? Probably under a very deferential sufficiency of the evidence. There was no Rule 29 here. There was no Rule 29. Right. Because I think it could have gone either way. That's the problem. That's why I raised this issue the way I did. Because the evidence could have gone either way. And that's what we do. We argue inferences. What we don't do is say, hey, I'm the United States of America, and my agent said this when he didn't. Again, I'll go back to my first point, because I think it's the strongest. I can't conceive the government retrying this case without bringing the scope operator. Because the scope operator could say, I saw him cross the border, or I didn't see him cross the border. And it would be a definitive deterioration. You're over time. We'll give you a minute or two for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, I'm Mark Connell, and I represent the United States of America. Were you the prosecutor? No, Your Honor. Okay. Judge Miller's mother passed away, or else he would be here today. The reason this case is important is because the evidence could not have gone either way. The evidence in this case was overwhelming. And when taking Agent Garcia. How was it overwhelming that they did not see him cross the border and maintain constant vision of him? I believe a careful examination of Agent Garcia's testimony makes it very clear that Agent Garcia was describing two distinct areas. And the description of those two distinct areas is very important for the Court to make it clear in this case and why the jury has such a short deliberation time. In context of Agent Garcia's entire testimony, the statements by the prosecutors were not misstatements. He stated. What is the testimony of Agent Garcia that is so overwhelming? Yes, Your Honor. If we could start by turning to page 5. Yes. Of the excerpts of record. If you begin there, Agent Garcia describes the two distinct areas, beginning by talking about the area in which he was assigned. And he says on page 5, line 21. He was in my assigned area at that time. He was in a bush close to a canal just north of the border. And what we know from the record is this is approximately a mile into the United States. That's very important. This is the first area that's referenced. An area near or just a mile into the United States. And he describes contacting the defendant in a canal. And then he goes on to describe the second area here, which is an area next to the border. He says on page 6, line 3. Based on footprints found by the border by my partner. So he begins by describing what happened that day. He's been asked. How did you first come in contact with the defendant? And he says, well, based on footprints found by the border by my partner. And our remote video surveillance or camera team observed the subject in the area. Now, when he says area, it's important for the court. It's saying that they observed him in the area. They didn't say that that was the first time they observed him. They just said as to the area where I arrested him. Yes, sir. The area I arrested him, our video surveillance team saw him in that area. Does that mean that that was the first time they saw him? Does it mean that they weren't tracking him from the time he crossed the border? Yes, Your Honor. I understand the question. And the reason that we can deduce from this record that he did not watch him cross the border is they talk about footprints. Now, why footprints are important. Just to describe this to begin with, where the footprints were found was right next to the border, in an area where border patrol agents drag a road to make a surface that is unmarked. So when someone does step into that surface, they know they have jumped the fence. And they know the approximate time when they've jumped the fence because they know when they drug the road. And that's when the first, when he's first asked, how did you come in contact with the defendant? He doesn't say, well, the camera operators saw him jump the fence, and the camera operators followed him for that mile into this area, and then the camera operators directed us there. What he does say is my partner found footprints. Footprints would have never come up in this case, Your Honor, had they been in constant video surveillance of the defendant because footprints wouldn't matter. You don't need footprints when you have video that watches him jump the fence. Now, what you just said right now was not brought out in the examination. Correct, Your Honor, that it was not brought out. You just filled in the gaps there. I filled in the gaps from the record, and I can point the court to the areas in the record where there's talk about the video and the fact that the video camera was used for one purpose. It was used that day for a singular purpose, and that purpose was to direct them and find them in the area where he was located. And, in fact, if I may, I can direct the court. I gather your point is that his partner found the footprints or noticed the footprints in the area near the border, that drag strip area. Yes, Your Honor. That they testified to. And that somehow or other the camera crew was alerted. Yes, Your Honor. Right? Is that what? That's correct. Is that what we're supposed to draw from this? It is, Your Honor. And if you could turn to page 34 of the record, I believe that that's where they discuss this, that the cameras that day were used for looking for him in that area and that alone. In which area? The only area that's described as the area other than the border, and that's the area by the orchards. Well, how did they know to tell Agent Garcia to go, that they would find him, to look in the area near the orchard in the bushes? Once the Border Patrol agents found the footprints near the border, the camera is described as being used to locate him in the area near the orchards. These are cameras that it's at night. It's dark. But these cameras can see in the dark because they are looking for heat. And so they see this heat moving, the red heat that's emanating from the defendant, moving in the area of the orchard, and they direct him to that area. Importantly, he's not directed to the exact location. He searches for footprints again in the area of the orchard because he doesn't know exactly where he is, because he's not being given exact locations, because the camera wasn't panning along this entire mile from the time of the border all the way to the orchards. Okay, there's no jury, but it's a nice demonstration. Okay. What's important is the context of the geography. There's two areas here. The area by the border is what he first discusses, but then when he talks about the camera and when he talks about the camera's use that day, he's very clear that it's used in the area where he locates the defendant. Had the cameras watched the defendant jump the fence? Had the cameras... It's also clear that there were cameras at the border where they could have watched him, that would have shown him jumping the fence. Somebody could have monitored that. Yes, Your Honor, and I believe from the record... Back here, they don't jump the fence. He walks through the canals, I understand, and then has to go over a short fence when he gets on the other side. I believe there's a fence the entire way, but once he jumps the fence, they find the footprints. But you're right, Your Honor. From the record, there are cameras available, and cameras could have theoretically been following him the entire way. Right. Well, what was the function of the cameras here? You found footprints, you say, and then somebody notified the camera operator? Yes, Your Honor. And he then didn't know where he was? That's why he had to search for him? Yes. The cameras are located throughout, not only along the border, but there's actually cameras up throughout in the interior of the United States within that mile radius. And those cameras are used to locate individuals in the proximity of the border. But he had footprints, and he said, well, he couldn't have... they didn't know exactly where he was when they started to follow him with a camera. That's correct, Your Honor. So what use was the camera here? The camera is able to take a pan angle and be able to look and find the heat that's being radiated from individuals, from coyotes, things along those lines that are in that area, and then direct the Border Patrol agent, and he describes being directed to the general area, and then he describes once he's directed by the camera to the area of the orchards, searching for the defendant, and taking approximately 10 minutes to find the defendant. And it's important that he does describe that he was not directed constantly from the time of the border and the time that he's there. If the court would... the constant directions, it's on page 37 of the record, where he describes that he did not receive constant directions from the camera. If he had, he would have recalled that, and that's what would have happened. If they had first seen him cross the border, well, then they would have watched him from that entire time and given the Border Patrol agents constant directions to where he was. But rather, they describe footprints being found and then being directed to the orchards a mile north. The idea of one camera following him all the way through different terrain and trees a mile north, and then him having to search and look for footprints and find the defendant in a ditch was not a rational inference from the evidence. And the prosecutor's statements that they first found footprints and from there the camera operator directed them and helped them find him in the orchards was fair comment. But where... Oh, that was... there was no testimony to that effect. There was testimony to that effect, Your Honor, and I can describe that in beginning on page 37 of the record. It describes how he was not given constant directions. On page 37, it describes... The question is, had you been given constant directions by the video camera operator, would that have been something that you would have in your memory? Yes. Did that happen in this case? No, sir. And then he's described as on... continues on to talk about how it took about 10 minutes or more to look for the defendant and that he had to search for the defendant in that area. Had the camera operator said, take two steps right, three steps forward, look down in the bush, that's where he is, that's constant video surveillance. But describing footprints being found and then a camera directing you to a mile north. Well, if... Is it constant surveillance if the... an individual goes behind a hill where the camera doesn't see him as he's walking through the spots where the camera doesn't follow him? Does that terminate the surveillance? That's a very good point, Your Honor. That is not constant video surveillance. If the camera cannot view the defendant when he goes behind trees or goes behind a hill, that terminates the constant surveillance. Then when he is again located, he is found in the United States. And that's what the evidence discusses here, that he is found first with footprints and then the camera is used to look in the areas... No, that's a different question. I was asking you if the camera sees him across the border, follows him for a mile, except on a couple of occasions there's a tree in between when the camera operator can't see him, or he goes in an area where there's a ledge, rock, where they can't see him for 10 seconds, does that mean it's not constant video surveillance? Your Honor, I believe that. That's a question of degree. 10 seconds may be long enough to have not been constant video surveillance. Where he goes behind a tree for half a second, I believe that may continue to be constant video surveillance. But if the video cameras lose sight of the defendant for any significant period of time, 5 minutes, 10 minutes, then it is certainly not constant video surveillance. And the terrain described in this case, with the orchards and the trees and the canal, is determinative of that fact. That there was not constant video surveillance. But that's not clear from the testimony, though. We just know that from the way I read the canal, as it goes north, I understood that there was cameras along the canal as well. What may be helpful here for the Court is there was a map that was introduced as Exhibit No. 6. And that, unfortunately, was not made part of this record. But I do have a copy if the Court would like to see the map. And it shows where each of the cameras were located, and it shows where the orchard is in relation to the border. And I believe it's very enlightening as to why it is the idea of the video cameras having constantly surveilled him was not taken and considered seriously by the jury. Well, if it was introduced as an exhibit, it is part of the record. It is part of the record, Your Honor. It just was not attached to our supplemental evidence. It's not an excerpt record. Thank you, Your Honor. Would the Court like to see a copy of that map? Sure. I will provide you with the map, as well as the defense counsel. In fact, I'm sure somebody ordered the whole entire district court record. Yes, Your Honor. Just give them to the clerk. Well, you do agree that the statement made in the prosecutor's closing that Agent Garcia testified that the cameras were used to help locate him after he crossed the border, that that's not correct? Your Honor, I believe that statement, although not stated and articulated well by the prosecutor, is a correct statement of the entire testimony of Agent Garcia. And I believe the best area in the transcript to find that information is page 34 of the excerpts of record. On page 34, he states, and this is Agent Garcia when he's asked the question, in this particular case, was the use of the remote video camera or on cross-examination were you asked, were you told the area where to look for the defendant is that? He says, yes, sir, although that's not a well-worded question. He continues and says, and is that what the remote camera was used for on that day? So he's asking the question to follow up, is that what the cameras were used for that day, just to look for him in that area? And he says, yes, sir. And the next question is, and when you got to the area, did the remote camera tell you where it was or did you have to just go to the area to find it?  And so when he's asked about what the cameras were used for that day, he says specifically they're used only that day for locating him in the area, not... Well, that's okay. That may be a good inference from what he said, which is different from saying what his testimony was. And I agree with the court that they were not well-worded questions nor well-worded statements in closing arguments. But when taken in the entire context, when the jury saw the map and the court was there to hear this evidence just the day before, the court properly overruled the objection and the court had heard this testimony. And in fact, the court on two different occasions heard the objection and overruled the objection. And in... Yeah. Well, you know, the fact that the district court ruled a particular way is not an answer. I mean, if that were the case, we wouldn't have to be here. You know, I understand that the district court agreed with you, and that's why we have an appeal. Yes, Your Honor. In this case, I believe what's important about the district court's rulings are that the district court was in a position to have just heard this testimony, had just seen this map, had just seen the witness's initial on this map, where the cameras were, where the footprints were found, where the defendant was located in the orchard, had just had it described to the jury the sequence of the events. He wasn't found in the orchard. He was found north of the orchard. Just north of the orchard, Your Honor. That's correct. Hiding in a canal-type ditch. Now... And that proves, Ola, it proves that they did not watch him through any camera as he crossed the border. I believe the best evidence that he was not watched is when the agent is asked, how did you come in contact with the defendant? He doesn't describe, well, the camera operators had seen him cross the fence. Rather, he says, my partner found footprints. When we found footprints, the search began. And that's the sequence that he talks about. And although it is not entirely clear from the record that at that point they called to the cameras, what is clear is what the cameras were used for that day. And they were used to search for the defendant and locate him in the general area of the orchards. And that information was relayed to the agent. Let me ask you, how does this work? If a camera locates someone crossing the border, does that camera follow the person or does it turn it over to the next camera? The cameras are located in a camera room that have lots and lots of cameras and are staffed by, oftentimes, a team of agents. And they don't just watch one camera, but they watch multiple cameras. And when they're watching the cameras, they can't be constantly watching just one monitor, but they're moving from monitor to monitor trying to find movement, things that look as though there's someone entering. And these individuals don't write reports about what they do. It's very, very difficult, if not impossible, to go back and determine who of the camera individuals was watching a particular monitor at that time. Their job is then, once they find someone, to inform the people on the ground where they are and help them locate those individuals. Sometimes they see them cross the border, over the fence, and they say, we just had someone jump the fence in Sector 34, and they direct them to that area. Sometimes the old-fashioned method is used, and they find footprints from someone having jumped the border. And then the camera is used to locate that individual because they know approximately when they jumped the border. Because the drag road was done at a certain time, they find those footprints, and they say, within the last hour, we have a radius this large. Let's search the cameras, find that individual's heat that's being emanated, and direct those agents to the general location. What happens if they see someone cross the border and one of the Border Patrol agents goes and gets that person? What do they do with that person? That person generally is first asked to raise their hands for safety purposes. They're told this is a Border Patrol agent, it's an inspection, and that they are detained. They're almost always detained to determine their citizenship. In this case, that's what occurred. He was detained, his citizenship was determined, and he was arrested. But if they just crossed the border, what do they do with them? Because they are not found in the United States. Yes, Your Honor, I apologize. They are charged with a different crime, attempted entry. Attempted entry, okay. Yes, if the video camera watches them come into the country and directs the agents directly where they are at while they're under constant video surveillance, it's still a crime, but it's not a crime of being found in. It's not found in. It's attempted entry. Attempted entry. That's correct, Your Honor. And this defendant was charged with being found in because he was found in almost a full mile. The prosecutor in this case would have never anticipated a defense of official restraint for someone being found in almost a mile. But when it did come to be that to be the case, the prosecutor, in closing arguments, without the benefit of a transcript, looked back to the testimony and made statements that were rational inferences from the evidence as a whole that the footprints were found. He was directed to an orchard almost a mile in, and he specifically states, no, I wasn't given directions exactly to where the defendant was. I was given directions to a general area, and I had to search for him. I searched for footprints and eventually found him. Had he been under constant video surveillance, he would have had no need to search, and there would have been no mention of footprints. I see my time has expired.  Thank you. Thank you, Your Honor. Well, we gave your opponent, I think, a couple of time. If I may. We'll be reasonable with your time. That was a really good closing argument, and a lot of that was just flat-out good testimony. None of that happened at the district court level. The prosecutor didn't misstate the testimony once. He misstated it twice. Agent Garcia said they've got footprints, called it to the camera. Camera said, look here. He went there. That's at excerpt record 42. That's not true. That's not what Agent Garcia said. Excerpt record 55, the cameras were used to locate Mr. Moreno after he crossed the border, and that's what Agent Garcia testified to. That's not true. He didn't testify to that. Are there inferences in the record that the government attorney could have argued at trial? Yeah. But he didn't argue inferences. He misstated the evidence. Real quick. Exhibit number six. It doesn't add anything. It doesn't tell you anything about the range of the cameras, the degree that they can pan. It doesn't say a whole heck of a lot. Could the jury have drawn those inferences? Yes. The jury could have drawn those inferences. So then why is there prejudice? Because when the government misstated the evidence, it denied the possibility of the jury drawing another inference, which they could have drawn, that he was under constant surveillance. I thought they were told, though, that the prosecutor's statements are not to be taken as evidence. I agree. They got the general instruction. Twice. Yes. When you look at the first misstatement, the district court's ruling, well, overruled, the jury will be the ones who decide what the facts are. The second, more definitive, more egregious misstatement. Were they told what an inference is? You know, I can't say one way or the other. I would have to assume they were. It's a standard. It's a theory of general instruction, but I don't recall it. One last point to Judge Wardlaw's point. There may be another reason why they charge this as a found in, and that's actually because Mr. Moreno-Lopez was acquitted of an attempt reentry, and that's southern district, docket number 09CR. Separate offense? 318. Yes. I happen to be the attorney in the 09 case, and he was acquitted by a judge. I benched it. There's a reason I think they charge this as a found in rather than an attempt. Mr. Moreno has a history of winning at trial when it's an attempt. The government can pick what they're going to charge. They just can't monkey around with the evidence, and that's what they did here. If there are no further questions. Thank you. Thank you. Case to start. It will be submitted.
judges: Reinhardt, Wardlaw, Paez